IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| KIRK STICKLEY and MARY STICKLEY, Individually and on behalf of the ESTATE OF E.R.S., a deceased minor, | § § § § | |
| *Plaintiffs*, | § § | CIVIL ACTION NO. 1:21-cv-768-JRN |
| vs. | § § § | **JURY DEMANDED** |
| DOREL JUVENILE GROUP, INC., a foreign corporation, and DOREL INDUSTRIES, INC., a foreign corporation | § § § § § | |
| *Defendants*. | § | |

**PLAINTIFFS' RESPONSE TO DOREL INDUSTRIES, INC.'S
RULE 12(b)(2) MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Plaintiffs, Kirk and Mary Stickley, file this Response to Dorel Industries, Inc.'s ("DI") Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. 10).

**INTRODUCTION**

DI is multi-billion-dollar company with 4700 employees, maintains facilities in nineteen countries and is the largest child car seat manufacturer in the world. Long before this incident, DI concluded toddlers younger than four years of age were much safer in a rear-facing orientation than a forward-facing orientation in frontal collisions. This conclusion was based on the prevalence of frontal collisions (70% of all collisions) and the resulting forward jerk motion of the child's head and neck while the torso is restrained. In contrast, a rear-facing child seat cradle the head, neck, and spine in such a collision and avoids a spinal cord injury. E.R.S.'s parents followed DI's instructions in placing her forward-facing in the subject seat. E.R.S. was well within the age, height, and weight instructions to ride either forward facing or rearward facing in the subject seat. DI provided no warning or instruction that rear-facing was the safest position or that E.R.S. was

1

at greater risk of spinal cord injury if she was facing forward. As a result, E.R.S., just a year and five months old, suffered the exact injury a rear-facing car seat would have prevented --- a severe neck/spinal cord injury --- and lost her life.

DI seeks to divorce itself of this case on the assertion this Court cannot exercise personal jurisdiction over it. On a motion to dismiss, and before any discovery is taken, Plaintiffs' burden is to make only a *prima facie* case that this Court has personal jurisdiction over DI. That burden is easily met here. DI's own public and private statements, past court rulings, and sworn testimony make clear it exerts the type of control over its subsidiary, Dorel Juvenile Group ("DJG"), that subjects DI to this Court's jurisdiction. Additionally, DI purposefully availed itself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of Texas' laws. These activities included marketing, importing, and transporting juvenile products through Texas.

## ISSUE PRESENTED

Under the Fifth Circuit's law governing personal jurisdiction, does this Court have personal jurisdiction over DI given DI's control over its subsidiary DJG and direct contacts with Texas.

## ARGUMENT AND AUTHORITIES

The party seeking jurisdiction bears the burden of proof but must only present a *prima facie* case.[1] To determine whether a *prima facie* case exists, a court must accept the plaintiff's uncontroverted allegations as true and resolve all conflicts of "[jurisdictional] facts contained in the parties' affidavits and other documentation" in the plaintiff's favor.[2]

Because the Texas long-arm statute extends as far as constitutional due process permits, this Court need only consider if the exercise of jurisdiction comports with the Due Process

---

[1] *Pervasive Software, Inc. v. Lexware GmbH*, 688 F.3d 214, 219 (5th Cir. 2012).
[2] *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004)(citation omitted).

Clause.[3] "Where the plaintiff alleges specific jurisdiction, as here, due process requires (1) minimum contacts by the defendant (or its alter ego or agent) purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable."[4] "Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant" to make a compelling case that "the assertion of jurisdiction is unfair and unreasonable."[5] Here, DI does not attempt to argue exercising personal jurisdiction over it would not be fair or reasonable, much less provide any evidence supporting such an argument. Accordingly, DI has not met "the burden of making a compelling case that the assertion of jurisdiction is unfair and unreasonable."[6]

### A.    Plaintiffs Need Only Make *Prima Facie* Showing for Alter Ego At 12(b)(2) Stage

In the personal-jurisdiction context, a subsidiary's forum contacts may be imputed to its parent corporation.[7] To determine whether an alter-ego relationship exists, courts examine a set of identified factors.[8] Additional factors are also considered.[9] No single factor in this analysis is

---

[3] *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (citing *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309, 311 n.1 (5th Cir. 2007)).
[4] *ITL Int'l, Inc. v. Constenla*, S.A., 669 F.3d 493, 498 (5th Cir. 2012).
[5] *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018) (citing *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)).
[6] *Fintech Fund, F.L.P. v. Horne*, No. 18-20449, 2020 WL 6588619, at *4 (5th Cir. Nov. 10, 2020).
[7] *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 586 (5th Cir. 2010); *see Minn. Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1265 (Fed. Cir. 1985).
[8] *Miles v. Am. Tel. & Tel. Co.*, 703 F.2d 193, 195 (5th Cir. 1983)(identifying factors as: (1) distinct and adequately capitalized financial units maintained; (2) daily operations of the two corporations are separate; (3) formal barriers between management of the two entities are erected; and (4) those with whom the corporations come in contact are apprised of their separate identity. Other factors deemed important...are: (1) common stock ownership; (2) the method and degree of financing of the subsidiary by the parent; (3) common directors or officers; (4) separate books and accounts; (5) common business departments; (6) extent to which contracts between parent and subsidiary favor one over the other; and (7) connection of parent's employee, officer or director to subsidiary's tort or contract giving rise to suit).
[9] *Fundamental Innovation Sys. Int'l, LLC v. ZTE Corp.*, No. 3:17-CV-01827-N, 2018 U.S. Dist. LEXIS 118058, at *7-8 (N.D. Tex. Mar. 16, 2018); *Berry*, 428 F. Supp. at 554; *Hargrave*, 710 F.2d at 1162; *Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.*, 85 F.3d 201, 208-09 (5th Cir.1996)(identifying additional factors as (1) the employees of one corporation render services on behalf of the other corporation; (2) the subsidiary operates with grossly

dispositive.[10] "Alter ego determinations are highly fact-based and require considering the totality of the circumstances in which the instrumentality functions."[11] Courts do, however, apply a less demanding standard when analyzing alter-ego status in a 12(b)(2) motion than when evaluating liability.[12] In the Fifth Circuit, the alter ego test for purposes of attributing contacts for personal jurisdiction is less stringent than that for attributing liability.[13]

**B.      Agency Relationship Also Confers Jurisdiction**

Minimum contacts can also be imputed from one entity to another if an agency relationship exists between them.[14] For an agency relationship to allow for imputation of contacts, "the 'evidence must establish that the principal has both the right: (1) to assign the agent's task; and (2) to control the means and details of the process by which the agent will accomplish that task.'"[15]

**C.      Analysis of Alter Ego and Agency Factors**

DI's subsidiary, DJG, has previously appeared and does not contest jurisdiction before this Court. It is undisputed DJG markets, sells, and distributes many thousands of products for sale in Texas and has for decades, including the subject car seat.

   *i.      Common Stock Ownership*

DI is the corporate parent of DJG. DI owns 100% of Dorel U.S.A., and Dorel U.S.A., a holding company, owns 100% of DJG.[16]

---

inadequate capital; (3) the subsidiary receives no business except that given to it by the parent; (4) the parent caused the incorporation of the subsidiary; and (5) the corporations share property).
[10] *Fundamental Innovation Sys. Int'l, LLC v. ZTE Corp.*, No. 3:17-CV-01827-N, 2018 WL 3330022, at *3 (N.D. Tex. Mar. 16, 2018).
[11] *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 359 (5th Cir. 2003).
[12] *Spademan*, 772 F.2d at 1198 n.12.
[13] See *Carson v. Maersk, Ltd.*, 61 F. Supp. 2d 607, 611 (S.D. Tex. 1999) (citing *Stuart v. Spademan*, 772 F.2d, 1185, 1198 n. 12 (5th Cir. 1985) (among other citations).
[14] *Maxum Enters., LLC v. Auto. Fleet Enters., Inc.*, 2018 WL 3417234, at *3 (N.D. Tex. July 13, 2018).
[15] *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) (emphasis omitted) (quoting *Indian Harbor Ins. Co. v. Valley Forge Ins. Grp.*, 535 F.3d 359, 364 (5th Cir. 2008)).
[16] *Gorton v. Nordlund*, A04-2516, 2005 WL 3289426, at *1 (Minn. Ct. App. Dec. 6, 2005).

### ii. *Common Officers and Directors*

DJG's corporate formation in Massachusetts identifies Martin Schwartz and Jeffrey Schwartz of Westmount, Quebec and Toronto, Canada as members of the Board of Directors of DJG.[17] The Schwartz family owns the Dorel empire, including DI and its subsidiaries. DJG's Certificate of Authority for incorporation in Indiana lists the only Board of Directors as Martin Schwartz and Jeffrey Schwartz of Westmount, Quebec.[18] Both brothers have been longstanding members, and are current members of the Board of Directors of DI. Martin Schwartz is the current President and CEO of DI. Jeffrey Schwartz is the Executive Vice-President, Chief Financial Officer and Secretary of DI.[19] Jeffrey Schwartz is currently on the Board of Directors of DJG.[20]

### iii. *DI caused the incorporation of DJG*

DI completed its initial public offering in July 1987 following a merger between Dorel Co. Ltd., a juvenile products company founded by Leo Schwartz in 1962 and Ridgewood Industries, a ready-to-assemble (RTA) furniture company established by Martin Schwartz, Jeff Segel and Alan Schwartz in 1969. Initially selling to customers in Canada, DI expanded by entering the U.S. market and by establishing Dorel U.K. in 1988. Since then, DI has grown steadily, both organically and through a series of strategic acquisitions.[21] Cosco, Inc., a U.S. based company manufacturing and importing both juvenile and home furnishings products comprising two distinct divisions, DJG USA and Cosco Home & Office was formed in 1988.[22] In 2000, Safety 1st, a U.S. based juvenile

---

[17] *See* Corporation formation of DJG in Massachusetts; **Exhibit A.**
[18] *See* Certificate of Authority; **Exhibit B.**
[19] *See* Current Board of Directors of DI; **Exhibit C.**
[20] See DJG current filing documents in Indiana; **Exhibit D**.
[21] *See* DI Corporate History; **Exhibit E.**
[22] *See id.*

products company, part of DJG USA, was formed.[23] On July 2, 2001, Cosco Inc. and Infantino, Inc. was merged with Safety 1st, Inc. to form Dorel Juvenile Group, Inc., a DI company.[24]

> *iv., v. vi.   Daily Operations Between DI and DJG Are Not Separate; There Are No Barriers Between Management; No Separate Financing*

Nicolas Duran, based at DI's headquarters in Montreal, Canada, has acted as the President and CEO of Dorel Juvenile (which oversees Dorel Juvenile Group, Inc.) since 2016. In that role, Duran "[l]ead(s) a team of senior executives toward short and mid-range objectives to drive cultural transformation, agility and revenue growth to a +$1.0 billion revenue business model compromised of operations, R&D and manufacturing in multiple continents with sales across all distribution channels in over 100 countries." From Canada, Duran has refocused and reshaped DJG with a closer to market business model to better react to the market business model.[25] Duran's own statement was that he was leading the team.[26] Further, Duran regularly meets with executives of DJG on *at least* a *weekly basis*,[27] participates in tradeshows involving DJG and travels to DJG's offices in the United States.[28] DJG participates in conference calls with Duran whereby he provides input on product lines. Duran's role is to coordinate and work with all of the leaders of the different DI subsidiary companies.[29]

Ryan Hawker, corporate representative of DJG, testified DJG accesses DI's computer drives. Further, the Canadian files of DI are maintained on DJG's server in Columbus, Indiana and DJG has access to them.[30]

---

[23] *See id.*
[24] *See* Articles of Merger of DJG; **Exhibit A**.
[25] *See* DI Press Release announcing Nicolas Duran; **Exhibit F** and LinkedIn Profile**; Exhibit G.**
[26] *See id.*
[27] *See* Deposition of Ryan Hawker p. 21; **Exhibit H.**
[28] *See id.* p. 12; **Exhibit H.**
[29] *See id.* p. 13; **Exhibit H.**
[30] *See id.* 77; **Exhibit H.**

DJG employee Amber Seger, based in Columbus, Indiana, where the subject seat was manufactured, testified she coordinates regularly with DI employees based in Canada on compliance and marketing issues. Specifically, Seger coordinates with DI employee Elliot Levy.[31] Elliot Levy is the Director of Dorel Distribution in Canada based in Montreal at DI.[32] Seger also testified DJG and DI regularly exchange information using SharePoint-a Microsoft Teams application.[33] Seger also testified she regularly has meetings with DI, communicates via e-mail with DI and runs things by DI as DJG develops manuals.[34]

Dorel's 2017 Annual Report to shareholders, the year this car seat was manufactured, states Senior management of DI coordinates the businesses of all three segments (including DJG) and maximizes cross-selling, cross-marketing, procurement and other complementary business opportunities.[35] The Annual Reports in 2018, 2019, and 2020 state the same.[36]

Dorel Industries' Annual Report pursuant to Section 13(a) or 15(d) of the Securities and Exchange of 1934 reported to the United States Securities and Exchange Commission "Management of the Company **coordinates the businesses of each segment** and maximizes cross-selling, cross-marketing, procurement and other complementary business opportunities."[37]

DI's "Code of Business Conduct" dictates the actions of both DI and its subsidiaries and all of their respective employees. This includes but is not limited to: (1) complying with all laws, rules and regulations applicable to DI; and (2) ensuring the books and records for DI are complete

---

[31] *See* Deposition of Amber Seger pp. 10-12; **Exhibit I.**
[32] *See* LinkedIn Profile of Elliot Levy; **Exhibit J.**
[33] *See* Deposition of Amber Seger pp. 13-14; **Exhibit I.**
[34] *See* Deposition of Amber Seger pp. 8-9; **Exhibit I.**
[35] *See* Relevant Portions of DI 2017 Annual Report; **Exhibit K.**
[36] Available online at https://www.dorel.com/pages/financial-documents.
[37] *See* Dorel Industries Form 40-D (emphasis added); **Exhibit L.**

and accurate and any accounting or auditing concerns are reported. Any violation of DI's Code of Business Conduct subjects both employees of DI and DJG to potential discipline.[38]

In *Dorel Industries, Inc. v. Superior Court*, 134 Cal.App.4th 1267, 1279-1281 (2005), DI sought dismissal on nearly identical personal jurisdiction grounds. In holding the exercise of jurisdiction over DI was not unreasonable, the Court found significant evidence of DI's control over DJG.[39] *Cardenas v. Dorel Juvenile Group, Inc.*[40] also involved a jurisdictional challenge by DI in a case involving both DI and DJG. In that case, pending in the United States District Court, District of Kansas, the Court found considerable evidence of DI control over DJG.[41] In *Gorton v. Nordlund*, the Court of Appeals of Minnesota found direct evidence of DI's control over DJG and explained why it was reasonable to exercise jurisdiction over DI in Minnesota.[42]

    vii.    *Contracts between DI and DJG*

DI is the sole owner of all patents and manufacturing licenses for its products.[43] Thus, to the extent DJG designs, manufacturers or distributes any Dorel branded products, DI owns both the patents and exclusive rights to those products.

    viii.    *Common Business Segments and DI provides all business to DJG*

DI operates in three distinct reporting segments: Dorel Home, Dorel Juvenile and Dorel Sports.[44] DJG falls under the Dorel Juvenile Segment. Senior management of the Company coordinates the businesses of all three segments and maximizes cross-selling, cross-marketing, procurement, and other complementary business opportunities.[45] All three segments market,

---

[38] *See* DI Business Code of Conduct; **Exhibit M.**
[39] See *Dorel Industries, Inc. v. Superior Court*, 134 Cal.App.4th 1267 (2005); (highlighted portions); **Exhibit N.**
[40] 358 F. Supp. 2d 1042, 1045–48 (D. Kan. 2005).
[41] *Id.* (see highlighted portions); **Exhibit O**.
[42] *Gorton v. Nordlund*, A04-2516, 2005 WL 3289426, at *1-6. (Minn. Ct. App. Dec. 6, 2005)(unpublished)(highlighted portions); **Exhibit P**.
[43] *See* SEC Statement and *Gorton v. Nordlund*, A04-2516, 2005 WL 3289426, at *2 (Minn. Ct. App. Dec. 6, 2005).
[44] *See* DI 2020 Annual Statement; **Exhibit Q.**
[45] *See id.*

advertise and promote their products through the use of advertisements online, via social media and on DI-owned websites, in specific magazines, multi-product brochures, and other media outlets. DI's major retail customers also advertise Dorel's products, principally through circulars and brochures.[46]

      *ix.      DI and DJG Share Property*

Manufacturing and warehousing operations of DJG are based in Columbus, Indiana where car seat development is centralized at the *DI owned and funded* state-of-the-art Dorel Technical Center for Child Safety. Additionally, DI's West Coast warehousing of DJG products is in Ontario, California at 5400 Shea Center Dr, Ontario, CA 91761.

Documents identified in *Gorton v. Nordlund*, A04-2516, 2005 WL 3289426, at *2 (Minn. Ct. App. Dec. 6, 2005) demonstrate the significant sharing of property between the entities.[47]

Weighing the unconverted documentation and other evidence in a favor of Plaintiffs and considering the factors of alter ego and agency, Plaintiffs have made a *prima facie* showing this Court has jurisdiction over DI on an alter ego and agency basis.

**D.      Specific Jurisdiction-DI's Direct Contacts With Texas**

The Supreme Court held earlier this year in *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 209 L. Ed. 2d 225 (2021), the due process test for specific personal jurisdiction does not depend on a strict causation-only approach that would ask where the at issue product was originally sold, or where it was designed and manufactured. Instead, a manufacturer's substantial business in a forum state supports specific personal jurisdiction.[48] Accordingly, DI's adhesion to "case-specific jurisdiction" is misplaced.

---

[46] *Id.*
[47] *Gorton v. Nordlund*, A04-2516, 2005 WL 3289426, at *2 (Minn. Ct. App. Dec. 6, 2005).
[48] *See id.*

To rebut DI's arguments on this issue is particularly difficult without further discovery. Simply put, only DI would possess information about DI's activities in Texas. However, based only on the limited information available it is clear DI's Texas contacts are more extensive that its motion would suggest. Like Ford, DI has enjoyed the benefits and protection of Texas laws—"the enforcement of contracts, the defense of property, the resulting formation of effective markets."[49] In May, 2002, DI showcased a series of products *in Texas* at the annual International Juvenile Products show including Cosco and Safety 1st brands.[50] The Safety 1st brand is the same brand of child car seat involved here. Upon information and belief, DI ships products from its Mexican plant to ports in the United States, including ports in Texas.[51] DI also announced in a press release on June 20, 2016, it would exercise its legal rights in Texas to launch a vigorous appeal to the Texas trial court, and if, necessary, the 5th Circuit Court of Appeals following a Texas jury's verdict against DJG. Further, DI has participated and, in some cases, accepted jurisdiction in multiple lawsuits in Texas.[52]

## CONCLUSION AND PRAYER

For all these reasons, Plaintiffs pray the Court denies Dorel Industries, Inc.'s Motion to Dismiss. In the alternative, Plaintiff objects to any final determination of Dorel Industries, Inc.'s Motion to Dismiss until after jurisdictional discovery is completed. Plaintiffs have sought leave to conduct targeted jurisdictional discovery by way of separate motion [Dkt. 12].

---

[49] *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1029, 209 L. Ed. 2d 225 (2021).
[50] *See* Dorel to Introduce New Products at Premiere Juvenile Products Show; **Exhibit R.**
[51] *See* Dorel shipments via subsidiary from Mexico to United States; **Exhibit S.**
[52] *See Escobar v. Cosco, Inc. et al*; 2:2002cv00074 Texas Eastern District Court, *Gonzales v. Cosco, Inc.* 2:2003cv00156 Texas Eastern District Court; *Patten v. Honeywell Int'l*, 2:2003cv00456 Texas Eastern District Court; *Gonzalez v. Cosco, et al*; 2:2004cv00017 Texas Eastern District Court; Patten v. Costco; 2:2004cv00127 Texas Eastern District Court; *Gonzales v. Cosco* 2:2004cv00171 Texas Eastern District Court;, *Scott v. Dorel*, et al 3:2009cv00799 Texas Northern District Court; *Brisco v. Dorel*, 2:2002cv00495 Texas Southern District Court; *Webb v. Cosco*, 4:2010cv05171 Texas Southern District Court; *Promote Innovation LLC v. Cycling Sports*, 2:2010cv0039 Texas Eastern District Court; *Brown v. Dorel* 4:2014cv01517 Texas Southern District Court.

Respectfully submitted,

                              */s/ Jeffrey T. Embry*
                              Jeffrey T. Embry
                              State Bar No. 24002052
                              Attorney-in-Charge
                              Christopher Peirce
                              State Bar No. 24046604
                              HOSSLEY & EMBRY, L.L.P.
                              515 S. Vine Avenue
                              Tyler, Texas 75702
                              Phone: 903-526-1772
                              Fax:     903-526-1773
                              jeff@hossleyembry.com
                              cpeirce@hossleyembry.com
                              **ATTORNEYS FOR PLAINTIFFS**

## **CERTIFICATE OF SERVICE**

      The undersigned counsel hereby certifies that a copy of this pleading has been served on all counsel of record via the Court's ECF system on this 6th day of December 2021.


                              /s/ *Jeffrey T. Embry*
                              Jeffrey T. Embry